The parties are neighbors. The plaintiff, Rufus L. Reed, is approximately 79 years old, has a third- or fourth-grade education and can read and write. The defendant, Thomas Jackson, is approximately 62 years old, has no formal education, and cannot read or write, except that he can sign his name. Reed is retired from Penn Central Railroad and Jackson has been employed at United States Steel for 38 years.
The dispute between these neighbors arises from the need of Reed to borrow money to complete the process of building a house on a vacant lot. In his complaint, Reed charges that Jackson, by fraud and misrepresentation, obtained his signature on a deed conveying to Jackson an interest in the property on which he was building the house. Reed further states that he made a mistake in signing the deed because he thought the instrument he was signing was a mortgage and that the entire transaction essentially was a debt security transaction.
Jackson counters by claiming that Reed thoroughly understands business transactions, understood this transaction, and merely seeks now to get out of what he considers to be a harsh arrangement. The lower court, although this issue was not raised by either of the parties, sua sponte ruled that the business dealings of the parties were so muddled that it was apparent that neither of the parties had sufficient capacity to conduct the business transaction of the nature of the one involved herein and that the purposes of equity would be best served by restoring the parties as nearly as possible to their respective positions before they began to deal together. We believe the trial court's resolution of this case to be in error and we reverse and remand.
Several issues are raised by the pleadings and evidence in this case, as well as one overriding issue relating to the extent to which a judge may sua sponte frame and decide an issue not raised by the parties in the litigation: *Page 752 
 1. Did the trial court err both in determining that the parties did not have the capacity to conduct their business and affairs and, as a consequence of that determination, in ordering the deed and mortgage involved herein cancelled?
 a. May a trial judge sua sponte inject an issue such as this in the litigation where the issue is not raised by either of the parties?
 2. Should the deed in this case have been cancelled because of failure of consideration?
 3. Did the plaintiff, Reed, fail to carry his burden of proof as to misrepresentation or fraud by Jackson? If not, should the court still have set aside the deed and mortgage because of a mistake made by Reed in signing the deed and the mortgage?
 4. Inasmuch as this was a debt security transaction, should not the court have construed the deed as essentially what it was, a mortgage?
 I.
This litigation presents an anomaly. Plaintiff Reed sought by his complaint to have a deed purportedly signed by him cancelled, but did not wish the mortgage signed by him cancelled because he believed it was truly the essence of the business transaction. On the other hand, the defendant, Jackson, did not wish the deed or the mortgage set aside, claiming that Reed understood the business transaction and now just simply attempts to get another agreement which he believes is more favorable to him. The trial court did what neither party wanted.
The facts in more detail are as follows:
Plaintiff and defendant live in the same community. One vacant lot separates their respective homes. In 1971, plaintiff purchased a vacant lot, on which the house he lives in is situated, for $3500.00. Immediately after Reed purchased the lot in 1971, he began acting as his own contractor in the building of the house. Jackson testified that in 1977 or 1978, Reed approached him about borrowing money to complete the house. Jackson testified that Reed said "he had went his limit . . . had done all he could do." Reed testified that he had invested an additional $8,000.00 on the property. At the time of the filing of the complaint, Reed said his property was worth $30,000, although at trial he testified it was worth $60,000.00. Jackson testified at the trial that the property was worth $40,000.00. According to Jackson, Reed could not borrow any money from a bank or savings and loan association because of his age and limited income.
After many conversations, Reed agreed to borrow and Jackson agreed to lend money to be used to finish the house which Reed had been attempting to complete since 1971. Jackson contacted his attorney, Jackson W. Guyton, who was also an officer of a mutual savings credit union, about the best way to handle the transaction. Guyton advised that first he should order a title policy to determine if Reed actually had clear title to the property. However, before the title binder was issued, Reed was anxious to get started on the completion of the house and wanted money immediately. Thereupon, Jackson had his attorney prepare four promissory notes, which Reed signed, and the money was advanced to Reed in accordance with the figures on the notes.
There is no dispute that later on, Reed signed a note and a mortgage in the presence of Guyton in the sum of $10,526.50. This amount of money was obtained by Jackson by making his own loan with the credit union. Prior to the loan closing, Jackson had advanced Reed money from his credit union loan account to pay for construction costs on the house. He did so by check. Guyton totalled the checks drawn on Jackson's account and found that there was still $2,922.00 owed to Reed to furnish full consideration for the execution of the $10,526.50 mortgage and note. Jackson immediately drew a check in this amount and it was endorsed by Reed. In spite of the inconsistency, Reed states that he never received any money from Jackson, but he admits that he endorsed checks amounting to the full amount of the mortgage signed *Page 753 
by him and that he signed the mortgage and note.
Later on, Jackson says that Reed stated he needed even more money to complete his house. Jackson says he told Reed he would not give him any more money unless his name was put on the deed with Reed. Jackson says that Reed agreed and both went to see Jackson's lawyer, Guyton, who in court testified that he accomplished the intention of the parties by having Reed execute to Reed and Jackson a joint right of survivorship deed which contained a typewritten clause to the effect that in the event Thomas Jackson predeceased Rufus Reed, the mortgage from Rufus Reed to Thomas Jackson would remain in full force and effect. The converse was, namely, if Reed predeceased Jackson, then of course, Jackson would have absolute title to the property and the mortgage to himself would be superfluous. Guyton further testified that the agreement was to the effect that Jackson would pay all insurance premiums and Reed would pay all taxes — of course this presented no obligation on Reed's part because Reed was a senior citizen and exempt from taxes. Guyton indicated that Jackson was present when the deed and the transaction were explained to Reed and that Reed executed the deed in their presence. Furthermore, Guyton called his secretary to listen to the explanation of the transaction and the secretary testified, in substance, at the trial to the same facts as related by her employer. The amount of money given to Reed for his execution of the deed is alleged to have been $1,000.00. Guyton testified that Reed stated that he had already received this $1,000.00, but Reed denied, as he did with reference to other money, that he had received the $1,000.00, although checks were introduced that would tend to substantiate the payment of this amount.
It was further testified by Guyton that payments on the mortgage were suspended as a result of the execution of the joint right of survivorship deed. However, Reed says that he attempted to make payments to Jackson, which he refused, and that it was then that he asked for whatever records were available on their business transactions. He says that he took those records to the Birmingham Trust National Bank, where he learned for the first time that Jackson had an interest in his property over and above a mortgage.
This case presents a very important question of the propriety of a court's sua sponte addressing and deciding an issue not framed by the pleadings. As with much of our jurisprudence, there are two views, one which holds that a court should,[1] and another that says it should not.[2] One of the reasons offered in support of the first view is that courts exist in order to mete out substantial justice. If a court determines that injustice would follow if a material issue not raised by the parties is not decided by the court, it is the duty of the court to decide that issue. Opponents of this position argue that to pursue this course of action would itself lead to injustice because the losing party would not have had the opportunity to rebut the argument accepted by the court, which indeed, may have been ill founded. However, it is generally conceded that a court should act sua sponte if a fundamental miscarriage of justice will otherwise ensue, and particularly where the court's jurisdiction is involved. Fundamental injustice is usually conceived of as relating to litigation of great public concern involving large numbers of people. It is not to be applied, as here, where the issue is not of great public concern, or of any jurisprudential importance.
We are of the opinion that even if the issue of the capacity of the parties had been raised, it has no relevance to the facts in this case. Our long recitation of the facts in this case makes it clear that the parties involved here, although lacking in education in the formal sense, did have the *Page 754 
requisite knowledge and comprehension to understand the matters they dealt with. Justice Simpson, in Fortune v. Boutwell,271 Ala. 592, 595, 126 So.2d 116, 118 (1960), capsulated the law as it existed at the time of his opinion (it has not changed since that time) with reference to capacity to make a conveyance of land. He stated:
 "We have stated the governing principle in varying language: Incapacity to understand the business transacted, as distinguished from mere sickness, must be proved in order to avoid a conveyance. Stanfill v. Johnson, 159 Ala. 546, 40 So. 223. A person with sufficient mental ability to comprehend what he is doing and understand the nature of the act and its consequences has capacity to make a deed. Frederic v. Wilkins, 182 Ala. 343, 62 So. 518; Harris v. Bowles, 208 Ala. 545, 94 So. 757; Hall v. Britton, 216 Ala. 265, 113 So. 238. Mere weakness of intellect is not sufficient to incapacitate a grantor and to warrant cancellation of a deed on ground of mental incapacity. McKinney v. Weatherford, 242 Ala. 493, 7 So.2d 259. The law presumes everyone to be sane until the contrary is proved, and it is unsoundness of mind and incapacity to understand the business transacted, in contradistinction to mere weakness, which must be proved in order to avoid a conveyance. Halman v. Bullard, 261 Ala. 115, 73 So.2d 351. Likewise, advanced age or mental enfeeblement is not sufficient to invalidate a conveyance unless the grantor's mind was so impaired as to render her incapable of acting intelligently and voluntarily in the conveyancing. Lee v. Menefield, 249 Ala. 407, 31 So.2d 581."
None of the conditions set forth above were met in this case; therefore, even if the doctrine of mental incapacity had been an issue in the case, the court would have been in error in attempting to apply it here.
 II.
Because a court can be affirmed if it reaches the right result, although for the wrong reasons, we will proceed to address the other issues properly raised in this case. Appellee argues that the court was right in cancelling the deed because $1,000.00 was grossly inadequate consideration for the transfer of an interest in the property by Reed to Jackson. We respectfully disagree. All other things being proper, a deed cannot be set aside because of inadequate consideration or for no consideration at all. Taylor v. Godsey, 357 So.2d 979 (Ala. 1978); Ingram v. Horn, 294 Ala. 353, 317 So.2d 485 (1975). Here, not only was there testimony that Reed received the amount of money stated in the mortgage, but also testimony that he received an additional $1,000.00 as well and an agreement that he did not have to pay anything on the mortgage unless Jackson predeceased him. Considering the difference in ages, 79 for Reed and 62 for Jackson, this does not appear, on the face of it, to be an unconscionable arrangement. In addition, Jackson was also obligated to keep up the insurance payments on the house. Furthermore, Jackson's advancement of about $12,000.00 represents over one-third the value of the property, if we take Reed's estimation of $30,000.00 for the value of the property, as originally stated in his complaint.
 III.
Reed's third contention is that Jackson misrepresented to him that an instrument he was signing was a mortgage when, in fact, it was a deed. There was no finding by the court below on this particular fact. Thus, we are permitted to judge facts unencumbered by any presumption in favor of the trial court. Guyton, a practicing attorney of many years, testified under oath, along with his secretary, that they carefully explained the nature of the transaction to Reed, and that he agreed to sign the deed and did so in their presence. It is not inconceivable that he would have done so, because our view is that the transaction was not to Reed's great disadvantage but, in fact, may have been to his great advantage. Considering Reed's denials that he had received any money at all, when the record shows that he had received over $11,000.00, we are of the opinion that he failed *Page 755 
to sustain his burden of proof on the issue of fraud and misrepresentation.
As to Reed's argument that he made a mistake when he signed the deed, we find the law squarely against him. If a grantor fails to read a deed which conveys realty he did not intend to convey, his mistake will be attributed to his own negligence.Taylor v. Godsey, supra. Reed testified that he could read and write; therefore, he must be held to the consequences of his own act.
 IV.
Reed's contention that the deed he signed should be construed as a mortgage, since the total transaction was a debt security transaction, we believe to have been answered in discussion of issue three. However, viewing the evidence without a presumption of correctness of the trial court's finding, we are firmly of the opinion that the facts do not justify the application of the principle of law which Reed wishes us to adopt in this case, namely that set out in Andress v. Parish,239 Ala. 67, 193 So. 727 (1940).[3]
Our view of the evidence is that Reed and Jackson both intended a transaction where an interest over and above the security interest was to be given to Jackson for the additional advancement of $1,000.00 and other consideration. We agree that the original basis for the business arrangement was a loan, but are firmly convinced that it subsequently matured to something else. This something else, although an afterthought, nevertheless met all the legal requisites of a proper conveyance and we so hold.
For the foregoing reasons, the judgment of the trial court is reversed and the cause remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
TORBERT, C.J., and JONES, ALMON and SHORES, JJ., concur.
[1] Rentways, Inc. v. O'Neill Milk and Cream Co., 308 N.Y. 342,349, 126 N.E.2d 271, 274 (1955).
[2] Hampton v. Superior Court, 38 Cal.2d 652, 656, 242 P.2d 1, 3
(1952).
[3] The Andress principle is as follows:
 "At common law, a deed of conveyance of land absolute and unconditional upon its face, but intended and understood by the parties to be merely a security for the payment of a debt, will be treated in equity as a mortgage, conferring upon the parties the relative rights and remedies of mortgagor and mortgagee, and nothing more. This rule is fully recognized and applied in this jurisdiction. Richardson v. Curlee et al., 229 Ala. 505, 158 So. 189; Hooper v. Reed
[211 Ala. 451, 100 So. 875; Fowler v. Haggins], 209 Ala. 176, 95 So. 816; Smith v. Thompson, 203 Ala. 87, 82 So. 101; Lewis v. Davis, 198 Ala. 81, 73 So. 419; Morton v. Allen, 180 Ala. 279, 60 So. 866, L.R.A. 1916B, 11.
 "In Corpus Juris, Vol. 41, Section 64, pp. 310, 311 and 312, the equitable principle invoked in this case is thus stated: "Under the settled doctrine of equity that the form of a transaction will never preclude inquiry into its real nature, but in all cases the intention of the parties must control, irrespective of the form, if a conveyance is made as a security for money in whatever form the conveyance is made, or whatever cover may be used to disguise the transaction and hide its real character from others, as between the parties and as to all persons who have notice that the property is merely held as collateral security, it will be held and treated as a mortgage. Every deed, therefore, whether absolute or conditional on its face, and whether made to a trustee or not, if made for the sole purpose of securing a debt is a mortgage, and can be enforced only as such."
 "This court has had occasion to apply the above stated equitable doctrine in numerous cases heretofore coming before it. The doctrine is sound and promotive of the ends of justice, which after all is the end and purpose of legal jurisprudence."
Andress v. Parish, 239 Ala. at 69, 193 So. at 729.